UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DOUGLAS GREGORY, : | |
|     Plaintiff, : | |
| v. : | C.A. No. 11-423M |
| : | |
| CENTREVILLE SAVINGS BANK, : | |
| RAYMOND J. BOLSTER, II, CEO, : | |
| PRESIDENT AND CHAIRMAN OF THE : | |
| BOARD OF INVESTMENT, : | |
|     Defendants : | |

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

    Plaintiff Douglas Gregory ("Plaintiff" or "Mr. Gregory") claims that his former employer, Centreville Savings Bank ("the Bank"), and its President and Chief Executive Officer, Raymond J. Bolster, II, ("Mr. Bolster") fired him because of his age in violation of the Rhode Island Civil Rights Act ("RICRA"), the Rhode Island Fair Employment Practices Act ("RIFEPA") and the Age Discrimination in Employment Act ("ADEA").[1]  After removal to this Court, Defendants challenged his claim by this Motion for Summary Judgment, contending that Mr. Gregory has failed to raise genuine issues of material fact regarding whether he met the Bank's legitimate job performance expectations and that he has failed to produce any competent evidence either affirmatively establishing age animus or exposing as pretextual the Bank's evidence that it terminated Mr. Gregory for nondiscriminatory reasons.

---

[1] Plaintiff's case was trimmed by a Dismissal Stipulation (ECF No. 11) entered by U.S. District Judge John J. McConnell, Jr., on July 13, 2012, which eliminated the Bank's Board of Investment as a defendant, and dropped the claim for retaliation.  At the hearing on this Motion held on November 28, 2012, Plaintiff's counsel informed the Court that the negligence claim of failure to adequately train and supervise should also have been dismissed; therefore, I recommend that Defendants' Motion be GRANTED as to Count IV.  What remains to be addressed by this Motion are Plaintiff's claims of age discrimination under RICRA (Count I), RIFEPA (Count II) and ADEA (Count III).

1

The Motion has been referred to me for a report and recommendation; a hearing was held on November 28, 2012. In the face of overwhelming and largely undisputed evidence of a host of troubling job performance issues, including his use of work time and a Bank computer to view pornography, his failure to implement a plan for improvement of Bank procedures, his lackadaisical attitude towards his job responsibilities and the post-firing discovery that his work time had been employed in writing unwelcome love poems to a female coworker, I find that Plaintiff has failed to sustain his burden of establishing unlawful age animus. Therefore, I recommend that the Motion be GRANTED.

**I. FACTS[2]**

Until he was demoted in May 2010, Douglas Gregory had been employed by the Bank as its Senior Vice President/Residential Lending since 2001. This position placed him in charge of the Bank's residential lending area, with responsibility for making judgments about the Bank's underwriting decisions and the Bank's insider trading policy in his department and for supervising the Bank's other residential lenders. He reported to the Bank's Senior Lender, who was in charge of overall lending and, in turn, reported directly to the President of the Bank. For the brief period from his demotion until he was placed on leave on June 11 and then fired on June 21, 2010, Mr. Gregory was a Vice President in the Residential Lending department. Born on June 12, 1951, he was fifty-nine years old when his employment ended. When he was fired, he had been employed at the Bank for almost thirty-two years.

The Bank is a state chartered mutual savings bank, regulated by state and federal law; it is audited annually by the Federal Deposit Insurance Corporation ("FDIC"), which establishes its financial soundness rating.

---

[2] Unless indicated, these are the undisputed facts laid out in the parties' Statements of Undisputed Facts, pleadings, deposition transcripts and affidavits.

2

The decision to demote and then fire Mr. Gregory was made by Raymond Bolster, who had been promoted from the position of Executive Vice President and Treasurer to President and CEO of the Bank in 2006. His duties as President and CEO include the management of the Bank's daily operations, which he performed along with subordinate managers who acted at his direction. Since taking over the Bank's operations in 2006, he has had sole responsibility for decisions relating to the termination of employees of the Bank. Mr. Bolster was born in 1947 and was sixty-two years old when he fired Mr. Gregory.

Plaintiff glibly asseverates that throughout his almost thirty-two years as an employee of the Bank, he provided loyal service and acted consistently with the Bank's policies and directives. However, he also concedes that, by 2007, if not earlier, this was not true: it is undisputed that, during his final years with the Bank, Mr. Gregory was engaged in conduct that either he admits violated the Bank's policies and directives or that the Bank perceived violated its policies and directives.

The first violation to be exposed began at some point prior to December 2007 (Mr. Gregory claims he cannot recall how long he had been doing it) and continued until he was caught and confronted in January 2008. Mr. Gregory admits that he violated the Bank's Computer Acceptable Use policy by viewing pornographic and sexually explicit websites during working hours on his Bank computer. In December 2007 alone, Mr. Gregory visited, or refreshed these sites with information, 2,959 times. Moreover, by the time this transgression was memorialized in his performance evaluation on May 1, 2008, it was only one of three issues. In addition to viewing pornography while he was supposed to be working, he admits he had violated Regulation O[3] by allowing his personal checking account to become overdrawn, which

---

[3] Regulation O is codified at 12 C.F.R. Pt. 215 (1983). It governs any extension of credit by a bank to a "bank insider." It was adopted to implement a governance provision of the Federal Reserve Act, 12 U.S.C. § 375b, which

3

had been flagged by the FDIC, and he admits he had transferred certain of his responsibilities to another Bank employee without authorization. Mr. Bolster told Mr. Gregory that he was "very, very unhappy" about his conduct and warned him that a repeat would be cause for immediate termination; however, Mr. Gregory was not demoted. ECF No. 13-1 at 14-15.

Mr. Gregory's next performance issue arose as a result of a December 2009 report from Brintech Management Solutions ("Brintech"), a management consulting firm to the financial services industry, which had been engaged by the Bank to make recommendations for improvement of its operations. The resulting recommendations included specific suggestions for improvement of the residential underwriting functions. Mr. Bolster expected Mr. Gregory, as the employee in charge of that area of the Bank, to implement the Brintech recommendations; however, it is contested whether Mr. Gregory knew of this expectation. Indeed, while he admits he was aware of the recommendations, Mr. Gregory hotly disputes that he was told to implement them. While Mr. Bolster asserts that Mr. Gregory was told, he also avers that, given his position, he expected that Mr. Gregory should have understood that this was his responsibility. It is undisputed that after four months and numerous meetings about the Brintech report, during which Mr. Gregory failed to take any action to implement any of the recommendations, Mr. Bolster demoted him in May 2010. Mr. Bolster testified that this action was based on his determination that Mr. Gregory lacked the ability to implement the report. In contravention, Mr. Gregory claims only that Mr. Bolster never directed him to implement the recommendations and that he was not told that his demotion was based on his failure to do so.

---

was based on congressional findings that "insider self-dealing is a major reason for the deterioration of a bank's condition" and that federal banking statutes provided insufficient protection against abuse of a bank by insiders for their benefit. J. V. Mattingly, Annual Review of Banking Law, "Insider Lending Restrictions And Reporting Requirements Under The Financial Institutions Regulatory And Interest Rate Control Act Of 1978, As Amended," 3 Ann. Rev. Banking L. 21 (1984). Regulation O prohibits overdrafts by bank insiders, among other matters. Id. at 26; see also 12 C.F.R. § 215.4(e).

Case 1:11-cv-00423-M-PAS   Document 22   Filed 01/04/13   Page 5 of 17 PageID #: 218

The final straw arose while the Brintech report was in progress. The Bank's audit and compliance personnel had been addressing serious concerns about potential violations of various Bank loan policies regarding insider loans, ethics and federal regulations. Through counsel, the Bank engaged Sobel & Co. ("Sobel"), an accounting firm recommended by the Bank's external auditors, to investigate further the possible violations. The Sobel investigation included reviewing loan files, interviewing eight Bank employees and consulting with the Bank's executive management team. The Sobel interviewers, who talked to all of the relevant Bank employees, including Mr. Gregory, were members of Sobel's Forensic Financial Accounting/Litigation Services Group and were highly qualified to perform such interviews. Because the matter was so serious, the FDIC was informed on an on-going basis of the investigation. As part of that monitoring, Mr. Bolster spoke to the FDIC about the actions he should or should not take regarding the employees whose job performances were criticized in the Sobel report.

Mr. Gregory was interviewed on May 26 and 27, 2010, in the board room at the Bank. He explained how he performed his job duties, and the investigators asked him questions about his underwriting process using at least two specific loan files as examples. Sobel later issued a written report of its investigative work, with a write-up of each interview, including that of Mr. Gregory.

The Sobel report on the Gregory interview was not flattering; it essentially described him as unable or unwilling to perform his duties competently. After the Sobel team gave Mr. Bolster a preliminary report on the interview, he placed Mr. Gregory on paid administrative leave. Based on Sobel's verbal and written reports, he concluded that Mr. Gregory was failing to conduct meaningful and effective scrutiny of the loans submitted to him as an underwriter and

5

that Mr. Gregory's incompetence put the Bank at risk for financial loss and other harm. This conclusion, coupled with all of the other performance issues of which Mr. Bolster was then aware, resulted in the decision to terminate Mr. Gregory, which was done on June 21, 2010.

Mr. Gregory does not dispute that Sobel was engaged as the Bank claims, that he was interviewed and that the resulting report was very negative. Instead, he contends that the interviewers were hostile and threatening, that they insulted him and that, while he concedes that the loans they questioned him about were ugly, he had discretion to approve them. Without further elaboration, he asserts that Mr. Bolster's primary reason for terminating him was not the Sobel report, but rather was his age.

The discovery that Mr. Gregory was guilty of yet another serious violation of Bank policy was made after the decision to terminate, while Mr. Gregory was on leave. During the cleaning of his office, the Bank uncovered covertly-stored poems and love letters, 147 pages, to or about a younger, less-experienced co-worker with less authority, Ronda Felici. These billets-doux were written between 2006 and 2010 on his work computer and printed on the Bank's printer. Mr. Gregory admits that they were his compositions, that he showed Ms. Felici between ten to fifteen poems during work, and that he knew she was "obviously, not happy about it." ECF No. 13-1 at 23. She later told the Bank that she was embarrassed but thought that she could handle the situation herself; as a result, although he gave her the creeps and made her uncomfortable, she told him to stop and was rude to him, but did not file a formal complaint. This conduct violated the Bank's Anti-Harassment policy.[4] The Bank maintains that the poor

---

[4] Mr. Gregory argues that his admitted conduct did not violate the Policy. This position collapses on review of the Policy, which prohibits unwelcome communications of a sexual nature. ECF No. 13-2 at 2-3. Further, all that is material is that Mr. Bolster perceived that Mr. Gregory had violated the Policy, whether he did or not. Dávila v. Corporación de P.R. Para La Difusión Pública, 498 F.3d 9, 16-17 (1st Cir. 2007).

6

judgment shown by this behavior would have resulted in the decision to terminate Mr. Gregory, if he had not already been fired.

Conceding his conduct was wrong (though his testimony also focused on his foolishness in leaving the love poems where they could be found), Mr. Gregory does not dispute any of these facts except that his conduct violated the Policy and the conclusion that this would have resulted in his termination. However, beyond his sworn statement that "I would not have been terminated in the Felici matter," ECF No. 18-1 at 3, he provides no credible factual support for disputing Mr. Bolster's sworn statement that this was a firing offense, especially coming on the heels of the pornography discovery.

After Plaintiff's termination, the Bank hired Lisa Reid in July 2010 as its new Vice President/Senior Residential Lender. Ms. Reid became the Bank's Senior Residential Lender upon hire and soon thereafter became the Bank's Senior Lender. She took over all of Plaintiff's underwriting and operational responsibilities.

To buttress his claim of age animus, Mr. Gregory relies on the following:

- He was told by another employee that she was told by another employee that she overheard Mr. Bolster say that an employee with an employee number under 100 should no longer be employed by the Bank. [5]

- The lower the number, the older the employee.

- Mr. Gregory's employee number is 11.

- Two other unnamed employees in their late fifties were terminated at about the same time.

- At an unspecified time, as a cost-saving measure, the Bank had changed its pension plan for new hires by reducing the calculation from 3% of base compensation to 1.25%.

---

[5] Mr. Gregory presents two versions of these tiers of hearsay. In his affidavit, he averred that he spoke directly to the eavesdropper who overheard Mr. Bolster. In his deposition, he testified that he spoke to another employee, who spoke to the eavesdropper, who overheard Mr. Bolster.

7

The Bank responds that the employee number reflects not age, but the employee's length of employment with the Bank, and that it is illogical that Mr. Bolster would have made such a comment because his own employee number is 28. Mr. Bolster denies making any such statement.

## II. LAW

### A. Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). A fact is material only if it possesses the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)). However, the non-moving party may not rest merely on conclusory allegations or denials, but must present affirmative evidence of specific facts demonstrating a genuine issue as to each element on which he will bear the ultimate burden at trial. See Santiago-Ramos, 217 F.3d at 53 (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "Even in cases where elusive concepts as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Johnston v. Urban League of R.I., Inc., C.A. No. 09-167S, 2011 WL 2297655, at *3 (D.R.I. May 17, 2011) (alteration in original) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). The non-moving party's evidence must have substance in that "it limns differing versions of the truth which a factfinder must resolve." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989).

B. Application of Summary Judgment Standard to ADEA Claim

Employment discrimination claims arising under the ADEA are analyzed under the familiar burden-shifting methodology outlined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), and further delineated in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-60 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-24 (1993). The McDonnell Douglas burden-shift is applicable in cases like this one where the plaintiff lacks direct evidence of discrimination. Velázquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007).

Under this framework, Plaintiff must produce evidence sufficient, if believed, to establish a *prima facie* case. See Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 333 (1st Cir. 1997); Jefferson v. Gates, CA 09-537 ML, 2010 U.S. Dist. LEXIS 75010, *23 (D.R.I. July 2, 2010). A *prima facie* case consists of competent evidence that: 1) he was at least forty years old; 2) he met the employer's legitimate job performance expectations; 3) he experienced an adverse employment action; and 4) the employer had a continuing need for services provided previously by the plaintiff. Velázquez-Fernández, 476 F.3d at 11; Hoffman v. Applicators Sales

9

& Serv., Inc., 439 F.3d 9, 17 (1st Cir. 2006). The burden for establishing a *prima facie* case is not onerous. Douglas v. J.C. Penney Co., 474 F.3d 10, 14 (1st Cir. 2007).

If Plaintiff establishes a *prima facie* case, the burden of production – but not persuasion – shifts to the Bank to articulate a legitimate nondiscriminatory basis for the adverse action. Hidalgo, 120 F.3d at 334. Once the Bank satisfies its burden, the presumption of discrimination created by the *prima facie* case drops away and "[t]he burdens of proof and persuasion fall squarely upon the plaintiff to demonstrate that the defendant's tendered explanation is only a pretext and that discrimination was the true motive underlying the hiring decision." McGarry v. Pielech, 47 A.3d 271, 280-81 (R.I. 2012). Plaintiff cannot defeat the Bank's Motion for Summary Judgment if "the record is devoid of adequate direct or circumstantial evidence of discriminatory animus of the part of the employer." Hidalgo, 120 F.3d at 335 (quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 843 (1st Cir. 1993)).

    C. Application of Summary Judgment Standard to State Law Claims

Plaintiff's age discrimination claims based on state law (RIFEPA and RICRA) are analyzed under the same framework. See Morrissette v. Honeywell Bldg. Solutions SES Corp., C.A. No. 10-12-ML, 2011 WL 3652428, at *3 (D.R.I. Aug. 17, 2011); Neri v. Ross-Simons, Inc., 897 A.2d 42, 48-50 (R.I. 2006) ("This Court has adopted the federal legal framework to provide structure to our state employment discrimination statutes."); Casey v. Town of Portsmouth, 861 A.2d 1032, 1036-38 (R.I. 2004) (same in case involving claims under RIFEPA and RICRA). Thus, in age-based employment discrimination cases under Rhode Island law, the parties must engage in the same three-part burden-shifting paradigm. McGarry, 47 A.3d at 280-81. "[C]ourts have recognized that this is a difficult burden to meet." Id. at 281.

**III. DISCUSSION**

The Bank argues that Plaintiff has failed at step one to establish a *prima facie* case because, while he has satisfied the first, third and fourth elements, he has failed to produce proof that he met the Bank's legitimate performance expectations. In support of this contention, the Bank points to the undisputed evidence of his many peccadillos, including his settled practices of eschewing work for surfing the internet for pornography and writing harassing love notes and poems, his inability or unwillingness to implement the 2009 Brintech recommendations and his blasé approach to his critical residential underwriting responsibilities. Plaintiff's contra proof consists of his mantra that he provided loyal service for thirty-two years and his rebuttal that he was not "directed" to implement the Brintech recommendations.

Mr. Gregory has not produced evidence of educational attainments or experiential accomplishments qualifying him for his position as did the successful plaintiff in Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 139 (1st Cir. 2012) (evidence of training as engineer, well-rated experience in manufacturing and pharmaceutical sectors and positive reviews over eleven years with employer). In the face of the Bank's overwhelming evidence, there is certainly a substantial question whether he has satisfied the second element of a *prima facie* case; nevertheless, for the sake of argument, and because it does not alter the ultimate outcome, the Court indulges Plaintiff and assumes he has made the requisite showing. Dávila v. Corporación de P.R. Para La Difusión Pública, 498 F.3d 9, 11 (1st Cir. 2007); Hidalgo, 120 F.3d at 333; Jones v. Johnson and Wales Univ., C.A. No. 08-476ML, 2010 WL 3703516, at *7 (D.R.I. Aug. 20, 2010) (court assumes *prima facie* case despite skepticism in light of lack of competent evidence). Therefore, the analysis next turns to the Bank's proffer of a legitimate, non-discriminatory reason for firing Mr. Gregory.

Through the sworn statement of the decisionmaker, Mr. Bolster, the Bank asserts that it fired Mr. Gregory based primarily on the Sobel interview, which led to Mr. Bolster's conclusion that Plaintiff lacked the ability or inclination to perform his job competently and that his incompetence put the Bank at risk, [6] and secondarily on his proclivity to use work time to view internet pornography and his failure to understand that it was his job to address the Brintech recommendations. This evidence is sufficient to establish that the Bank has satisfied its burden of articulating a facially adequate nondiscriminatory motive for Plaintiff's discharge. Dávila, 498 F.3d at 11. With this showing, the presumption of discrimination created by the assumed *prima facie* case disappears, and the burden reverts to Plaintiff to prove not only that these reasons are pretextual, but also that the true reason for the Bank's action was his age. Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 78 (1st Cir. 2005); Sanchez v. P.R. Oil Co., 37 F.3d 712, 720 (1st Cir. 1994). "[T]he bottom-line question of discrimination vel non comes front and center." Dávila, 498 F.3d at 11.

Plaintiff's proffer fails in that he does not present definitive competent evidence either of pretext or of age bias.

In assessing a claim of pretext in an employment discrimination case, this Court must focus on the motivations and perceptions of the actual decisionmaker. Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007). In the absence of competent proof that the decisionmaker harbored a discriminatory animus, it is not enough to argue that his perception may have been incorrect. Id. Rather, Plaintiff must show that Mr. Bolster did not believe in the accuracy of the reason given. Ronda-Perez v. Banco Bilboa Vizcaya Argentaria-P.R., 404 F.3d 42, 45 (1st Cir.

---

[6] One wrinkle addressed by neither party is that Mr. Gregory's demotion changed his job responsibilities at almost the same time that he was interviewed by the Sobel team. There is no suggestion that his demotion resulted in a material diminution of his duties such that it becomes critical to understand whether the inadequacy flagged by Sobel was in relation to his former position only. The Bank contends that his incompetency was so profound that it posed risk of financial loss and other harm. Since Mr. Gregory does not parse the viability of this conclusion by reference to his pre- and post-demotion positions, neither should this Court attempt to do so.

2005). Here, Mr. Gregory defends his failure to implement the Brintech recommendations by claiming Mr. Bolster never directed him to do so, while Mr. Bolster avers that his perception was that Mr. Gregory's duties were such that he should have known without being told. Similarly, Mr. Gregory tries to undermine the Sobel report by arguing that the interviewers were rude, while Mr. Bolster avers that his perception was that the Sobel interview compelled the conclusion that Mr. Gregory was incompetent. Whether or not these perceptions were "wise or foolish, correct or incorrect, sound or arbitrary" is beside the point. Dávila, 498 F.3d at 12 (if employer believed job performance not up to snuff, not province of court to second-guess). This Court should not inject itself into the merits of the decision as a super personnel department; proof of mistaken judgment does not give rise to evidence from which a factfinder can infer age was the reason for discharge. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991). Plaintiff's facts attack tangential matters, but do not establish that the perceptions that drove Mr. Bolster's decision were pretextual. See Dwyer v. Sperian Eye & Face Prot., Inc., Civil No. 10-cv-255-JD, 2012 WL 16463, at *3 (D.R.I. Jan. 3, 2012) (to demonstrate pretext, plaintiff must show weakness, implausibility, inconsistency, incoherency or contradictions in the reasons as to make them rationally unworthy of credence; it is not enough to challenge tangential aspects of reasons).

      Plaintiff presents three facts to support his contention that Mr. Bolster harbored age bias that impermissibly colored his perception of Mr. Gregory: 1) an alleged stray comment based on hearsay from an eavesdropper; 2) two other employees over fifty[7] left the Bank in approximately the same time period; and 3) the Bank changed its pension plan to save costs. None sustain his burden.

---

[7] The parties dispute their ages. Plaintiff claims they were in their fifties, while the Bank says both were sixty-two.

The claim that Mr. Bolster was supposedly overheard – illogically since his own number was well below 100 – to say that "an employee with an employee number under 100 should no longer be employed by the Bank" is rank hearsay and probative of nothing at the summary judgment phase. Bennett, 507 F.3d at 28-29 (affidavit stating that others told plaintiff his supervisor considered him too old is inadmissible hearsay that cannot be considered on summary judgment); see Kenney v. Floyd, 700 F.3d 604, 607 (1st Cir. 2012); Gómez-González v. Rural Opportunities, Inc., 626 F.3d 654, 666 (1st Cir. 2010).

Even if Plaintiff were to present the sworn statement of the eavesdropper, the First Circuit has held that an age discrimination claim cannot rest on the foundation of a stray remark, which is the best label that can be placed on Mr. Gregory's proof. He provides the remark with no context nor timing nor linkage to any employment decisions. At summary judgment, this Court should reject stray remarks that lack the probative value and materiality to satisfy a discrimination plaintiff's burden of proof. Compare Acevedo-Parilla, 696 F.3d at 144 (evidence supported inference that decisionmaker's remark "temporally and causally connected" to termination), and Drumm v. CVS Pharm., Inc., 701 F. Supp. 2d 200, 207 (D.R.I. 2010) (content, timing and context sift stray remarks from those connected to decision), with Cameron v. Idearc Media Corp., 685 F.3d 44, 50 (1st Cir. 2012) (sales manager's statement that the problem with old guys was that they remembered how it used to be insufficient to prevent summary judgment), and Booker v. Mass. Dep't of Pub. Health, 527 F. Supp. 2d 216, 227 (D.Mass. 2007) ("'[S]tray remarks in the workplace . . . normally are insufficient to prove [an] employer's discriminatory animus."). This stray remark also fails to prove age animus because it relates not to the age of the workers, but to their length of service. In the absence of evidence beyond Plaintiff's *ipse dixit* that the Bank's employee roster is such that length of service is a viable proxy for age, it is

not enough. Bramble v. Am. Postal Workers Union, AFL-CIO, Providence Local, 135 F.3d 21, 26 (1st Cir. 1998) ("[W]here an employment decision is premised upon an age-correlated but analytically distinct factor, a violation of the ADEA has occurred only if there is additional evidence that the employer was motivated by an age-discriminatory animus.").

Plaintiff's second unadorned contention – that two other employees in the protected age class left the Bank at about the same time – is equally unavailing. The Court is left to speculate how this establishes that Plaintiff's termination was tainted by age animus. There is no need for further rumination on this factoid. Hidalgo, 120 F.3d at 338 (court should not speculate about possible inferences to be drawn from facts). Cf. Acevedo-Parrilla, 696 F.3d at 43-45 (reasonable inference of age animus may be drawn from evidence that, in relevant time period, employees fired almost all in protected age category, while almost all new hires were under forty). Similarly, the third piece of evidence – the Bank's change in its pension plan – does not permit an inference of age animus. It proves only that, like other employers concerned with costs, the Bank made a change that yielded savings. See Cameron, 685 F.3d at 50; see also Pub. Emps. Ret. Sys. of Ohio v. Betts, 492 U.S. 158, 170 (1989) (age-based reductions in employee benefit plans not evidence of age discrimination).

To close this book, Plaintiff's evidence fails to sustain his burden of challenging the Bank's reasons for terminating him or of establishing that Mr. Bolster was motivated by discriminatory intent. Therefore, summary judgment in favor of Defendants is in order.

The Court nevertheless pauses to consider the Bank's further argument that, if this case somehow proceeds, Mr. Gregory's proclivity for using his work day to write love letters and poems, some of which were used to bother a female co-worker, bars his claim for back and front pay. Such post-firing undisputed evidence of misconduct may be considered if the "wrongdoing

was of such severity that the employee in fact would have been terminated on those grounds alone had the employer known of it at the time of the discharge." McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 363 (1995). Here, the Bank presents the testimony of Mr. Bolster that this discovery would have tipped the scales against Mr. Gregory and resulted in his termination. Such after-acquired evidence does not bar all relief against an employer guilty of discrimination, id. at 361-62, but reinstatement and front pay are completely eliminated as remedies, while back pay is eliminated from the "date of the unlawful discharge to the date the new information was discovered." Id. at 362. Here, the timing of the discovery of the love letters and poems – at almost the same time as the termination – would foreclose back pay.

Plaintiff attempts to counter that the after-discovered evidence eliminates the remedies of reinstatement, front pay and back pay by asserting that "[t]his incident would not have led to his termination." His only factual basis for this conclusion is that Ms. Felici did not file a complaint. He also argues that his conduct was not sexual harassment under the law or Bank policy. These unsupported conclusions and optimistic surmises are insufficient to rebut the Bank's evidence. Bennett, 507 F.3d at 30 (granting summary judgment against plaintiff who had been fired for sending "anonymous, sexually tinged poems" to co-worker at work). The Bank employed Plaintiff at-will and had the legal right to fire him whether or not his inappropriate conduct violated the law or the letter of the Bank policy. In light of his history of violating Bank policy by using Bank computers to visit pornographic sites, Mr. Bolster's undisputed threat to terminate him for the next such transgression and Mr. Bolster's testimony that this was a firing offense, summary judgment on this contingent matter is also appropriate.

**IV. CONCLUSION**

For the foregoing reasons, I recommend that Defendant Centreville Savings Bank's and Raymond Bolster's Motion for Summary Judgment (ECF No. 12) be GRANTED, both with respect to all of the Counts remaining in the case and with respect to Plaintiff's ability to seek the remedies of reinstatement, front pay or back pay.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its service.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 4, 2013